COMMONWEALTH *vs.* DENNIS MICHAEL DAYE.

Suffolk. September 11, 2001. - December 12, 2001.

Present: MARSHALL, C.J., GREANEY, IRELAND, SOSMAN, & CORDY, JJ.

*Homicide. Practice, Criminal,* Capital case, Grand jury proceedings, Disqualification of judge, Examination of jurors, Challenge to jurors, Argument by prosecutor, Assistance of counsel. *Evidence,* Exculpatory, Grand jury proceedings, Identification, Tape recording, Consciousness of guilt, Relevancy and materiality. *Grand Jury. Identification. Jury and Jurors.*

There was no merit to a criminal defendant's contention that the Commonwealth, in obtaining indictments against him, had omitted any known exculpatory information in its presentation to the grand jury. [467-468]

A criminal defendant failed to demonstrate any basis to suppress an identification made by a Commonwealth witness during the probable cause hearing. [468-469]

A trial judge, in acting on a criminal defendant's motion for recusal, properly determined that he could discharge his duties fairly and without prejudice to the defendant, and properly inquired into the relevant objective facts to ascertain that his impartiality could not reasonably be questioned in the circumstances. [469-470]

A trial judge, after conducting an inquiry into a juror's prior knowledge of a witness, his knowledge of any other witnesses, and any familiarity with the case, and after hearing the juror's assertion that he could be fair and impartial, was under no obligation to pursue any further inquiry [470-471], and correctly refused to allow the defendant's late peremptory challenge to the juror [471].

At a murder trial, the judge properly excluded from evidence a tape recording of a statement given to police by a Commonwealth witness, where the tape recording contained large segments of inadmissible hearsay; further, there was no basis on which to admit portions of the tape recording as prior inconsistent statements, or as probative of the witness's demeanor. [471-473]

At a murder trial, the judge properly allowed the Commonwealth to introduce evidence of the defendant's flight as evidence of his consciousness of guilt; error, if any, arising from the exclusion of the defendant's statement to a witness regarding his reasons for flight was, in light of the judge's instructions to the jury, of no consequence to the jury's assessment of the consciousness of guilt evidence. [473-474]

At a murder trial, the judge properly excluded certain expert testimony that had no basis in the evidence [474], and properly admitted evidence that the defendant, when he was arrested, possessed bullets similar to those used to kill the victim [474-475].

At a murder trial, no prejudice, or substantial likelihood of a miscarriage of justice, arose from remarks made by a prosecutor during closing argument regarding threats made by the defendant, the Commonwealth's standard of proof, the definition of provocation, the failure of the defendant's alibi witnesses to come forward to the police, or the failure of the defendant to call certain other alibi witnesses to testify at trial. [475-477]

A criminal defendant failed to demonstrate that asserted errors by his trial counsel in failing to make a timely peremptory challenge to a juror or in failing to object to the prosecutor's closing argument constituted ineffective assistance. [477-478]

No reason appeared on the record of a murder trial for this court to exercise its authority under G. L. c. 278, § 33E, to reduce the jury's verdict or to order a new trial. [478-479]

INDICTMENTS found and returned in the Superior Court Department on April 30, 1986.

Pretrial motions to dismiss and to suppress evidence were heard by *Paul A. Chernoff*, J.; the cases were tried before *James D. McDaniel, Jr.*, J., and a motion for a new trial, filed on June 4, 1998, was heard by him.

*Rosemary Curran Scapicchio* for the defendant.

*Jane A. Sullivan*, Assistant District Attorney, for the Commonwealth.

SOSMAN, J. The defendant was convicted of deliberately premeditated murder in the first degree and unlawfully carrying a handgun. He now appeals from those convictions, as well as the denial of his motion for a new trial. On appeal, the defendant asserts error in (1) the denial of his motion to dismiss the indictments; (2) the denial of his motion to suppress an identification made at the probable cause hearing; (3) the trial judge's refusal to recuse himself; (4) the judge's rejection of a belated peremptory challenge to a juror; (5) various evidentiary rulings at trial; and (6) inflammatory and inaccurate statements in the prosecutor's closing argument. The defendant also complains that he received ineffective assistance from counsel. He also asks that we exercise our power under G. L. c. 278, § 33E, to reduce the murder verdict or grant him a new trial. We affirm the convictions and the denial of the motion for a new trial, and we decline to reduce the murder verdict or order a new trial under G. L. c. 278, § 33E.

1. *Facts*. The facts viewed in the light most favorable to the

Commonwealth are as follows. The victim, Robert Dolan, was a member of the 714 Club, a private men's club in the East Boston section of Boston. Dolan was at the 714 Club on the evening of February 9, 1985, and admitted his friend, Mary Drohan, when she arrived at the club shortly after midnight. At that time, there were between six and eight people in the club. The defendant and his girl friend, Darlene DiGianvittorio, knocked on the door of the 714 Club around 2 A.M. and were allowed in by another member.

The defendant and DiGianvittorio joined the victim and Drohan in drinking, shooting pool, and playing cards. About one hour later, the four entered a back room of the club where they ingested cocaine. At some point, the defendant took out a handgun and concealed it somewhere in the club, saying that he could not afford to be caught with the weapon in his possession. By approximately 4 or 5 A.M., all of the other members of the club had gone, and only the foursome remained.

Sometime after daybreak, the conversation turned to getting breakfast, but the defendant and DiGianvittorio did not want to leave the club. Because the defendant was not a member of the 714 Club, the victim could not leave the two in the club alone. The victim and Drohan prepared to depart, and tried unsuccessfully to cajole the other two into leaving with them. An argument then broke out between the defendant and his girl friend, during which DiGianvittorio began throwing things around the club. The victim then asked the two to leave the club, but they still refused.

After again asking DiGianvittorio to leave, the victim took her by the waist and ushered her toward the door. The defendant demanded that the victim unhand his girl friend, and threatened to "blow him away" if he did not. The victim again told the defendant and his girl friend to go, at which point the defendant pulled out his handgun and told the victim, "You know I will blow your fucking head off, and don't think I won't. You know I'm crazy."

After repeating his threat several times, the defendant put the gun away for a moment, but then drew it again and asked, "Why, you don't think I will do it?" The victim raised his arms in the air, and the defendant fired a single shot into the victim's

chest from arm's length. The victim grabbed his chest and ran out the door of the club. Drohan screamed that the defendant had shot her friend, to which the defendant replied, "Yes."

Drohan ran out the door to aid the victim, and found him lying in a snow bank a few doors down from the club. The defendant followed, grabbed Drohan by the arm and told her to come with him. She refused, insisting that she could not abandon the victim. The defendant threatened that he would "blow .[her] head off" if she "ever said a word," that he was "serious," and that she "should know by now [his] reputation." He then ran from the scene.

Emergency personnel and police arrived at approximately 11:30 A.M. At the scene, Drohan initially told police that she knew nothing about the shooting. Boston police Officer Ronald DiNocco, a family friend, gave Drohan a ride to her sister's house in his cruiser. During the ride, she told Drohan that she knew who shot the victim, but did not disclose a name. That afternoon, in a tape-recorded interview conducted at the police station, Drohan told police investigators that she and the victim had both left the club; that she and the victim had parted; that she then heard a shot; and that she returned and found the victim lying in the snow. She denied seeing the shooting, and denied having seen any confrontation between the defendant and the victim. The next day, Drohan telephoned police investigators, and on February 13, 1985, she testified before a grand jury, at which time she described the argument at the club and the defendant's shooting of the victim. At trial, Drohan told the jury that she had lied to the police on the day of the shooting because she feared for her personal safety.

During the autopsy, the medical examiner retrieved a .38 caliber bullet from the victim's body. He opined that, despite the nature of the wound, the victim would have been able to run some distance from the club prior to his collapse.

Shortly after the shooting, Boston police searched for the defendant at his parent's home in Winthrop, and at DiGianvittorio's house in East Boston. For the next several months, they looked for the defendant in the Orient Heights area of East Boston, but to no avail. Almost ten months later, on December 5, 1985, special agents of the Federal Bureau of Investigation

(FBI) arrested the defendant at a motel in Atlanta, Georgia. He had approximately forty .38 caliber bullets in his possession. He also had an identification card in the name of "David Delaney," and had previously registered at the motel under the name "David Delaney," listing a social security number three digits off from his own number.

2. *Motion to dismiss.* Before trial, the defendant moved to dismiss the indictments on the ground that the Commonwealth's presentation to the grand jury had omitted significant exculpatory evidence. Specifically, the defendant complained that the grand jury did not learn of Drohan's inconsistent statements to police, in which she claimed that the shooting occurred on the street, that she had not witnessed the actual shooting, and that there had been no prior confrontation between the defendant and the victim. The motion was denied.

"Prosecutors are not required in every instance to reveal all exculpatory evidence to a grand jury." *Commonwealth* v. *Trowbridge*, 419 Mass. 750, 753 (1995), quoting *Commonwealth* v. *McGahee*, 393 Mass. 743, 746 (1985). However, "a grand jury should be told of known exculpatory evidence that would greatly undermine the credibility of an important witness." *Commonwealth* v. *Mayfield*, 398 Mass. 615, 620-621 (1986), citing *Commonwealth* v. *Connor*, 392 Mass. 838, 854 (1984). A party seeking dismissal of an indictment for presentation of deceptive evidence must show that the deceptive evidence was given to the grand jury knowingly and for the purpose of obtaining the indictment, and that the presentation of that deceptive evidence probably influenced the grand jury's decision to indict. *Commonwealth* v. *Mayfield*, *supra* at 621-622.

We agree with the motion judge that the prosecutor did not fail to disclose to the grand jury any known exculpatory information. In her testimony to the grand jury, Drohan admitted that she had initially disclaimed any knowledge of the identity of the shooter and had "pretended it happened outside."[1] A police investigator also told the grand jury that Drohan initially told him that she had only heard the gunshot and

---

[1]Drohan testified before a grand jury on February 13, 1985, four days after the shooting. However, that grand jury took no action. After the defendant was apprehended some ten months later, the matter was presented to another

had denied knowledge of the identity of the shooter, and that the next day, when Drohan described the confrontation and shooting in the club, she explained that fear of the defendant had caused her to withhold information from the police. Thus, there was no failure to disclose the prior inconsistent versions Drohan had given to the police.

The defendant also claims that the prosecutor failed to present to the grand jury evidence of Drohan's consumption of drugs and alcohol at the club prior to the shooting. In fact, the prosecutor explicitly questioned Drohan on that subject before the grand jury, to which Drohan answered that she had had "a few drinks" and that she was "feeling good" at the time in question, but denied any drug use. At trial, she admitted using cocaine while at the club, but there is no indication in the record that the prosecutor knew of Drohan's cocaine use at the time her testimony was presented to the grand jury. See *Commonwealth v. Mayfield, supra* at 621.[2]

3. *Motion to suppress identification.* The defendant contends that the motion judge erred in denying his motion to suppress an identification made by Drohan at the probable cause hearing. During the hearing, a person other than the defendant was standing at the front of the dock, while the defendant was located behind several other people and out of Drohan's view. The prosecutor drew Drohan's attention to the area of the dock and asked her if she saw the defendant, to which Drohan responded that she did not. The prosecutor (who was under the mistaken impression that the person standing in the front of the dock was the defendant) pressed Drohan to make an identification. To her

grand jury, which then returned the indictments. A transcript of Drohan's February 13, 1985, testimony was read to the indicting grand jury.

[2]Because there was no failure to present either Drohan's inconsistent statement or her possible impairment by alcohol or drugs to the grand jury, we need not decide whether any such failure, had it occurred, would require dismissal of the indictments under the principles of *Commonwealth v. Mayfield*, 398 Mass. 615, 620-622 (1986). We note, however, that omission of such impeachment evidence would be unlikely to affect the outcome of the grand jury proceedings. Even with the full presentation of this impeachment evidence at trial, the jury found the defendant guilty beyond a reasonable doubt. "It would be rational to assume, therefore, that a failure to disclose the same evidence to a grand jury seeking only *probable cause* would have had a negligible effect on their decision to indict" (emphasis in original). *Commonwealth v. LaVelle*, 414 Mass. 146, 151 n.2 (1993).

credit, Drohan resisted all such suggestion and repeatedly insisted that the person standing in the dock was not the person who had come to the club that night. Ultimately, the person standing in the dock was determined to be a transportation officer; the defendant was brought forward; and Drohan then identified the defendant. Nothing in this scenario suggests any basis for suppressing Drohan's identification of the defendant. Rather, as the motion judge noted, her persistent refusal to be pressured into an inaccurate identification of someone else only served to bolster her ultimate identification of the defendant, a person she had met the week before the shooting and whom she had been with for many hours leading up to the shooting.

4. *Recusal.* Immediately prior to trial, the defendant asked for the trial judge to recuse himself, arguing that the trial judge had worked in the Suffolk County district attorney's office before his appointment to the bench; that he had worked "closely" with the prosecutor while at the district attorney's office; that he had initiated the prosecution of the defendant on an unrelated charge of attempted murder five years earlier; and that he had recently arraigned the defendant on an unrelated double murder. The judge stated that, although he could recall the name of the defendant, he had no recollection of any earlier case, and could not remember any details or even what the charges were.[3] Concluding that he bore no animus toward the defendant, the judge denied the motion.

"The matter of recusal is generally left to the discretion of the trial judge . . . and an abuse of that discretion must be shown to reverse a decision not to allow recusal" (citations omitted). *Haddad* v. *Gonzalez,* 410 Mass. 855, 862 (1991). A judge must "consult first his own emotions and conscience" to determine whether he possesses the capacity to rule fairly at trial. *Lena* v. *Commonwealth,* 369 Mass. 571, 575 (1976). Then, a judge must also conduct "an objective appraisal of whether . . . 'his impartiality might reasonably be questioned.' " *Haddad* v. *Gonzalez, supra,* quoting S.J.C. Rule 3:09, Canon 3 (C) (1), as appearing in 382 Mass. 811 (1981). A judge's impartiality might reasonably be questioned in circumstances where "he

---

[3]The docket confirms that another assistant district attorney tried the defendant on the earlier charges, and that that trial had concluded in 1981.

has a personal bias or prejudice concerning a party," or where "he served as a lawyer in the matter of controversy, or a lawyer with whom he previously practiced law served *during such association* as a lawyer concerning the matter" (emphasis added). S.J.C. Rule 3:09, Canon 3 (C) (1) (a) and (b).

Here, the judge properly weighed his conscience and determined that he could discharge his duties fairly and without prejudice to the defendant. He also inquired into the relevant objective factors: five years had elapsed since the he had briefly been involved in an unrelated charge against the defendant, he had no recollection of the underlying facts or circumstances in that matter, and the Dolan murder about to be tried had not even occurred until long after the judge had left the district attorney's office.[4] We conclude that the judge did not abuse his discretion in determining that he need not recuse himself.

5. *Voir dire and late peremptory challenge.* During voir dire, a juror reported to the judge that he had worked with one of the witnesses almost twenty years earlier. The juror no longer associated with the witness, but he had seen the witness around East Boston, where the juror lived.[5] The juror noted that he did not know any of the other witnesses, but that some of the names "sound[ed] familiar" because he lived in the East Boston area. The juror assured the judge that he could be fair and impartial, and the judge found him to be indifferent. The judge refused defense counsel's request that he question the juror further. During jury selection, that same juror was seated, and defense counsel did not exercise a timely peremptory challenge to that

---

[4]On appeal, the defendant suggests that the judge, reacting to an outburst by the defendant during a pretrial hearing, displayed bias when he told the defendant, in forceful terms, to speak to his lawyer and not to interrupt or address the judge himself. We disagree. While harsh words are not the preferred method for maintaining order in a court room (see S.J.C. Rule 3:09, Canon 3 [A] [3], as appearing in 382 Mass. 809 [1981]) ["judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others"]), a full reading of the transcript demonstrates that the judge took the measures he felt necessary to maintain control of the proceeding. Cf. *Commonwealth* v. *O'Neil*, 418 Mass. 760, 764-765 (1994). Nor do we believe, as the defendant asserts, that the judge's rulings during trial were influenced by any considerations other than the law. See *infra*.

[5]The juror also stated that he thought he might have heard about the incident. Further questioning by the judge revealed that the event the juror had heard about was unrelated to the Dolan murder.

juror. After the entire jury had been seated, trial counsel requested that the juror be removed, blaming the belated nature of his peremptory challenge on a misunderstanding between himself and his client. The judge refused.

On appeal, the defendant suggests that the judge abused his discretion by refusing to ask further questions of the juror. "[W]e will not conclude that the judge abused his discretion by empanelling [a] juror unless juror prejudice is manifest." *Commonwealth* v. *Seabrooks*, 433 Mass. 439, 443 (2001). The judge conducted an adequate inquiry into the juror's prior knowledge of the witness, his knowledge of any other witnesses, and any familiarity with the case. Having heard the juror's unequivocal assertion that he could be fair and impartial, the judge was under no obligation to pursue further inquiry. See *Commonwealth* v. *Szczuka*, 391 Mass. 666, 672 (1984). There was no abuse of discretion.

The defendant also alleges error in the judge's refusal to allow the defendant's admittedly late peremptory challenge. The judge complied with Rule 6 of the Rules of the Superior Court, which governs the exercise of peremptory challenges. Once a party has declined an opportunity to exercise a peremptory challenge as to a particular juror, a peremptory challenge to that juror is no longer available. Rule 6 then expressly provides: "No other challenging, except for cause shown, shall be allowed." We have previously held that deviation from the procedures outlined in Rule 6 constitutes reversible error, even in the absence of prejudice. *Commonwealth* v. *Brown*, 395 Mass. 604, 606-607 (1985). The judge properly enforced the requirements of Rule 6.

6. *Evidentiary rulings.* The defendant alleges various errors in evidentiary rulings at trial. Specifically, the defendant was not allowed to introduce a tape recording of a statement given by Drohan to the police; testimony from DiGianvittorio to rebut consciousness of guilt evidence; and expert testimony challenging Drohan's version of how the shot was fired. The judge allowed the prosecution, over the defendant's objection, to introduce the bullets found when the FBI captured the defendant ten months after the murder. Because these evidentiary challenges were preserved properly, we review the rulings for

prejudicial error. *Commonwealth* v. *Freeman*, 430 Mass. 111, 115 (1999).

a. *Tape recording of witness statement.* During her direct testimony, Drohan acknowledged that in her original statements to the police she had denied any knowledge of the shooting. Prior to the start of cross-examination, defense counsel asked for permission to play the tape recorded statement that Drohan had given on the afternoon of the shooting, in which she also denied seeing the actual shooting. The defendant argued that Drohan's demeanor throughout the statement, speaking "in a strong clear voice and a very assured fashion," belied her claim that she feared for her personal safety. The prosecutor objected on the ground that most of the statement was inadmissible hearsay, with only a small portion containing anything inconsistent with Drohan's trial testimony. The judge then listened to the specific portions of the recording that contained the inconsistent statements. He ruled that defense counsel could confront the witness with the contents of the inconsistent statements to see if she acknowledged them, and if she did not, then read the transcript of the statement, but he did not allow the tape recording itself to ·be played.[6] During cross-examination, Drohan admitted making each of the prior inconsistent statements that were contained in her statement to the police. Later, during the defendant's direct examination of the detective who had taken Drohan's statement, the precise text of the inconsistent portions of the statement was read to the jury.

The judge properly refused to admit the complete recording because it contained large segments of inadmissible hearsay. Regardless of the potential relevance of the witness's demeanor, the judge may exclude a recording that consists of such hearsay. See *Commonwealth* v. *Watson*, 377 Mass. 814, 834, 836 (1979), *S.C.*, 409 Mass. 110 (1991). With regard to those specific portions of the recording that constituted inconsistent statements, Drohan acknowledged each such inconsistency, the detective confirmed the precise wording she had used, and there was no basis or need for playing the tape to demonstrate the

---

[6]The judge also noted that the defendant could raise the issue again as the cross-examination of Drohan developed, but the defendant never did so.

inconsistency.[7] As to the assertion that, from hearing those inconsistent snippets alone, the jury could have assessed whether the witness's tone of voice belied her claimed fear of the defendant, we find the argument unpersuasive. Such an assessment could not be made·from isolated, short fragments of the interview.[8] There was no error.

b. *Consciousness of guilt.* The defendant contends that the judge erred in allowing the Commonwealth to introduce evidence of the defendant's disappearance and eventual capture after the shooting. There was no error. "A jury may consider evidence of a defendant's flight from prosecution as circumstantial evidence of his consciousness of guilt." *Commonwealth* v. *Cardarelli*, 433 Mass. 427, 436 (2001).

The defendant argues that, having admitted evidence of flight, the judge then erred in refusing to allow DiGianvittörio to testify that she met with the defendant approximately one month after the shooting, and that during that meeting the defendant told her that he planned to leave Massachusetts because he feared that the police were "framing" him for the murder and that they would kill him "because they are friendly with the Dolan family." The defendant contends that his statements to DiGianvittorio were admissible on the issue of his state of mind. While portions of his statements arguably reflected his state of mind (i.e., that he was afraid of the police and intended to flee), overwhelmingly they merely comprised statements of memory or belief (i.e., that police were "framing" him and would kill him because of friendship with the victim's family).

[7]Our decision in *Commonwealth* v. *Gordon*, 389 Mass. 351, 353-356 (1983), on which the defendant relies, is readily distinguishable. There, the witness testified that he did not recall the prior inconsistent statement, and the recording of the inconsistent testimony given at an earlier hearing was necessary for impeachment. The fact that the recording of that hearing had not been reduced to a written transcript did not preclude its use at trial. *Id.* at 355. Here, the witness admitted making the inconsistent statements, and a transcribed version was available.

[8]Moreover, we note that, in other portions of the interview, Drohan indicated that Daye had admitted to the shooting, expressed her fear of implicating Daye any further, and described her hysteria in the aftermath of the incident. Any fair assessment of the extent to which fear caused Drohan to minimize her claimed knowledge of the incident would have to be based on the entirety of her statement, portions of which addressed the issue directly.

See *Commonwealth* v. *Lowe*, 391 Mass. 97, 104-105, cert. denied, 469 U.S. 840 (1984). Without precisely parsing which discrete portions of the defendant's statement to DiGianvittorio might come within the state of mind exception, we note that Di-Gianvittorio was allowed to testify to the issue of the defendant's actual state of mind. She testified that he appeared "scared" and "nervous"; that the police officers involved in the case knew the victim's father; and that she expected the defendant to leave town and avoid the police "because he was in fear." We also note that the judge's detailed instructions on consciousness of guilt expressly cautioned the jurors that flight could be due to a fear of wrongful prosecution: "[Y]ou may consider whether the defendant's conduct was only a result of fear that he would not be believed, or that he would be erroneously charged with a crime or crimes he did not commit." To whatever extent some portions of the defendant's statement to DiGianvittorio may have been erroneously excluded, we are satisfied that such error was of no consequence to the jury's assessment of the consciousness of guilt evidence.

c. *Expert testimony.* The defendant sought to introduce expert testimony from a pathologist to offer an opinion about the height from which the gun was fired, on the theory that that height was inconsistent with Drohan's version of how the shooting occurred. The defendant claims that the judge erred in barring that expert testimony. A careful review of the record demonstrates that there were not sufficient facts in evidence to establish the precise positions of the defendant, the victim, and the gun at the instant of the shooting, and that the calculations made by the expert thus had no basis in the evidence. There was no error in the exclusion of this testimony.

d. *Ammunition found in the defendant's possession.* The defendant contends that the .38 caliber bullets found in his possession when he was captured had no connection to the Dolan murder, and were impermissibly introduced by the prosecution as evidence of bad character. Subject to the discretion of the judge, "it is commonly competent to show the possession by a defendant of an instrument capable of being used in the commission of the crime, without direct proof that that particular instrument was in fact the one used." *Commonwealth* v. *Toro*,

395 Mass. 354, 356 (1985), quoting *Commonwealth* v. *O'Toole*, 326 Mass. 35, 39 (1950).

In *Commonwealth* v. *Toro, supra,* we held that where there was evidence that the victim was killed by a .38 caliber bullet, the trial judge had discretion to allow the introduction of evidence that the defendant possessed .38 caliber bullets when he was arrested. *Id.* at 357. Although the defendant's arrest ten months after the Dolan shooting was temporally more remote than the arrest of Toro, we do not believe the trial judge abused his discretion in allowing the prosecution to introduce the .38 caliber bullets. As to the defendant's argument that the .38 caliber ammunition found in his possession was not the precise type of .38 caliber ammunition used to kill the victim, that is a factual issue to be determined by the jury, not a basis for excluding evidence.[9]

7. *Closing argument.* The defendant claims that various remarks during the prosecutor's closing were improper. We review those statements to which the defense attorney properly objected for prejudicial error, see *Commonwealth* v. *Santiago*, 425 Mass. 491, 500 (1997), *S.C.*, 427 Mass. 298, and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998), and the remainder to determine whether they create a substantial likelihood of a miscarriage of justice, see *Commonwealth* v. *McIntyre*, 430 Mass. 529, 542 (1999).

During his closing argument, the prosecutor asked the jury to consider, when weighing Drohan's conflicting statements to the police, that the defendant had threatened her and reminded her of his "reputation" immediately after the shooting. Defense counsel objected. The Commonwealth was entitled to explain why Drohan had given inconsistent statements to the police, and we see no error in the prosecutor's mention of the defendant's threats (which had included reference to his own "reputation") during closing argument. See *Commonwealth* v. *Pina*, 430 Mass. 266, 270 (1999).

The prosecutor told the jury that the mere existence of conflicting testimony did not necessarily create reasonable

---

[9]At the time the defendant sought to exclude the ammunition, the distinctions in the make of the bullets had not yet been raised by the evidence. When they were later raised, the defendant did not make any motion to strike.

doubt, and that the jury's job was to "search for the truth." There was no objection to this remark. These remarks were the prosecutor's introduction to a more specific discussion of the jury's function in assessing the credibility of witnesses, and they did not, in context, belittle the standard of proof beyond a reasonable doubt. They did not give rise to any substantial likelihood of a miscarriage of justice.

The defendant argues that the prosecutor erroneously described provocation as an act that would "reduce an individual to a state of frenzy, almost like temporary insanity." There was no objection at the time. While we agree that the prosecutor's proposed definition of provocation was an exaggerated and inaccurate statement of the law, we see no likelihood of a miscarriage of justice. The prosecutor's discussion of provocation emphasized repeatedly that the jury should "[t]ake the law exclusively from the judge, not from the lawyers," and the judge's instructions accurately defined provocation to the jury. Moreover, the defense was based on alibi, a claim that the defendant had long since left the club and was having breakfast with friends at the time of the shooting. The defendant never argued to the jury that there was provocation that would reduce the crime to manslaughter,[10] and the prosecutor's erroneous definition of provocation was of no consequence.

The defendant argues that the prosecutor made improper remarks about the defendant's alibi witnesses. The defendant had offered three alibi witnesses who claimed that the defendant was eating breakfast at a local diner with them at the time of the shooting. During his closing, the prosecutor asked the jury to take note that none of these witnesses had come forward to the police. There was no objection to this aspect of the prosecutor's closing. In order to impeach a witness because of the failure to provide exculpatory evidence to authorities prior to trial, a party must show that the witness knew of the pending charges in sufficient detail to realize that he possessed exculpatory information; that the witness had reason to make the

[10]Indeed, the record contains no evidence of provocation sufficient to reduce the crime from murder to manslaughter. The judge was of the view that the defendant was not entitled to a voluntary manslaughter instruction, but agreed to give the instruction "out of an abundance of caution."

information available; that the witness was familiar with the means of reporting exculpatory information; and that the defendant or the defendant's lawyer had not asked the witness to refrain from reporting the exculpatory information to the authorities. See *Commonwealth* v. *Roberts*, 433 Mass. 45, 50 (2000). A review of the record demonstrates that these requirements were met. There was no error in questions posed to these alibi witnesses on cross-examination or the use of the witnesses' answers in closing.

The prosecutor also made reference to the fact that three other alleged alibi witnesses, who were supposed to have been at the restaurant with the defendant on the day of the murder, were not called to support the defendant's version of the events. Defense counsel did lodge an objection to the prosecutor's argument on this issue. "Where a defendant has knowledge of an available witness whose general disposition toward the defendant is friendly, or at least not hostile, and who could be expected to give testimony of distinct importance to the defendant's case, but the defendant, without explanation, fails to call that witness, the jury may permissibly infer that that witness would have given testimony detrimental to the defendant's case." *Commonwealth* v. *Thomas*, 429 Mass. 146, 150 (1999). However, "[w]here a witness's testimony would have been merely cumulative or unimportant, there is no basis for such an inference." *Id.* at 150-151. Here, testimony from additional alibi witnesses would not have been merely cumulative. The alibi witnesses who did testify for the defendant were subjected (and vulnerable) to extensive impeachment. In light of the damage done to their credibility, further alibi testimony from noninterested witnesses would have been very important to the defense. Comment on the failure to produce those witnesses was proper.

Finally, the defendant argues that it was improper for the prosecutor to ask the jury, "How could you look yourselves in the mirror?," if they believed the defendant's alibi witnesses instead of Drohan. There was no objection at the time. We do not believe that this rhetorical question, albeit inappropriate, gives rise to any substantial likelihood of a miscarriage of justice.

8. *Ineffective assistance of counsel.* The defendant argues that

he received ineffective assistance of counsel at trial. Specifically, he contends that his attorney failed to make a timely peremptory challenge to a juror he thought might be biased, see *supra*, and that his attorney did not object to the prosecutor's prejudicial closing argument, see *supra*. We disagree.

In assessing a claim of ineffective assistance of counsel in a case of murder in the first degree, "[w]e consider 'whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion.' " *Commonwealth* v. *Duran, ante* 97, 101 (2001), quoting *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). By this standard, the defendant's claim fails.

It is true that, but for the alleged miscommunication between the defendant and his attorney during jury selection, the attorney would have exercised a timely peremptory challenge to an additional juror and that juror would have been excused. It does not follow, however, that the presence or absence of that particular juror was likely to have influenced the jury's conclusion. The judge had already found the juror indifferent, and there is no basis, apart from sheer speculation on the part of the defendant, to doubt that juror's indifference. As to the failure to make additional objections to the prosecutor's closing, we have already concluded that there was either no error or no substantial likelihood of a miscarriage of justice from any claimed improprieties in the prosecutor's closing.

*9. Cumulative errors and review under G. L. c. 278, § 33E.* We have reviewed the entire record as required by G. L. c. 278, § 33E. We note that the judge instructed the jury on all three prongs of malice, and that only the first prong of malice can support a conviction of deliberately premeditated murder. See *Commonwealth* v. *Simpson*, 434 Mass. 570, 588 (2001). However, the judge's instruction on deliberate premeditation clearly conveyed to the jury the requirement of finding an intent to kill, and the erroneous malice instruction thus raises no substantial likelihood of a miscarriage of justice. See *id.* at 588 & n.13; *Commonwealth* v. *Squailia*, 429 Mass. 101, 107 (1999); *Commonwealth* v. *Jenks*, 426 Mass. 582, 585 (1998). We decline

to exercise our authority to reduce the jury's verdict or order a new trial.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*