NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-08998


COMMONWEALTH  vs.  JAMES NORRIS.



Hampden.     September 10, 2019. - December 20, 2019.

Present:  Gants, C.J., Lowy, Cypher, & Kafker, JJ.


Homicide.  Constitutional Law, Assistance of counsel.  Evidence,
    Exculpatory, Third-party culprit, Alibi.  Practice,
    Criminal, Capital case, Required finding, New trial,
    Assistance of counsel, Preservation of evidence,
    Disqualification of judge.




    Indictment found and returned in the Superior Court
Department on March 7, 2000.

    The case was tried before Tina S. Page, J.; a motion for a
new trial, filed on November 12, 2003, was considered by her;
and a motion for a new trial, filed on June 23, 2016, was heard
by her.


    David H. Erickson for the defendant.
    Joseph G.A. Coliflores, Assistant District Attorney, for
the Commonwealth.


    CYPHER, J.  On November 7, 2001, the defendant, James

Norris, was convicted of murder in the first degree on theories

of premeditation and extreme atrocity or cruelty in the stabbing

death of the victim, Aaron "Chad" Scott. The defendant's direct appeal was consolidated with his appeals from the denials of his two motions for a new trial. The defendant raises various arguments on appeal. He asserts that his motion for a required finding of not guilty should have been granted; that he received ineffective assistance of counsel; and that the trial judge erred in admitting improper and misleading evidence, failing to sanction the Commonwealth appropriately for destroying exculpatory evidence, and failing to recuse herself. Finally, the defendant argues that the cumulative errors made during the trial amount to a violation of due process and his right to a fair trial.

After careful consideration of the defendant's arguments on appeal from his conviction and from the denials of his two motions for a new trial, we affirm his conviction and the denials of the motions, and we decline to grant extraordinary relief pursuant to G. L. c. 278, § 33E.

Background. We recite the facts the jury could have found, viewing the evidence in the light most favorable to the Commonwealth, while reserving certain details for later discussion.

The defendant lived with a relative on Wilbraham Road in Springfield. The defendant sold drugs for the victim and his brother, who sublet a home on Brickett Street in Springfield

from the defendant.  The victim's body was found in the early morning hours of January 18, 2000, in the Brickett Street home (house) after four anonymous 911 calls directed police to the residence.

The previous evening, at approximately 10:30 P.M., the defendant telephoned Dan Brunelle, a casual associate, to ask for a ride to the house.  Brunelle had driven the defendant to the house many times before because Brunelle occasionally purchased "crack" cocaine from the defendant or the victim.

When Brunelle arrived to pick up the defendant twenty minutes later, the defendant got into Brunelle's van and said, "I'm going to do Chad."  After convincing Brunelle that he was joking, the defendant asked Brunelle to stop a few doors away from the house to pick up David Johnson, whom the defendant had invited along to smoke marijuana.[1]  During the drive, Brunelle complied with the defendant's request to lend Johnson his gloves, but once they arrived at the house Brunelle became nervous about the defendant's earlier "joke."  He got out of the van, stood by the front bumper, and demanded his gloves back.

Brunelle remained in the van while the defendant and Johnson approached the house.  Brunelle saw the pair enter the

---

[1] The defendant and David Johnson previously sold drugs together, became friends, and resumed a drug business when Johnson was released from prison.

home, and a silhouette of a third person in the kitchen. Brunelle testified that a moment later, Johnson "burst out" through the storm door, turned around, and put his full weight against the door, "containing what was clearly a struggle on the inside." In a panic, Brunelle drove away to the home of Charles Varner, whom Brunelle considered a brother-in-law.

Johnson testified that when he entered the home behind the defendant, the defendant and victim had already begun to fight. During that fight, the two men fell against the storm door, which swung open and hit Johnson in the face. After pushing the door shut, Johnson heard the victim say, "Are you going to leave me for dead? Are you going to leave me for dead? I got kids . . . I got little boys," but all Johnson could see was the defendant's arm making "up and down" movements. As Johnson backed away from the door, it "flew open," and the defendant called out to Johnson for help with the victim's body. Shocked and believing the defendant had a knife on him, Johnson remained at the scene, where he witnessed the defendant try to push the victim's body down a flight of stairs before taking a pot of water that was on the stove and splashing it throughout the kitchen and the exterior of the home.

Once Johnson left the scene, the defendant followed. Johnson testified that after going to a bar to get change, the defendant used a pay telephone to call someone to help him

dispose of the body and clean up. As Johnson and the defendant returned to the scene, Johnson saw a vehicle in the driveway.

Inside the vehicle were Varner and his friend, Keith Freeman, who had arrived at the house after Brunelle had told the men what he had witnessed. Varner testified that when he and Freeman initially arrived at the scene, Varner knocked on the door, but no one answered. As he turned to get back into his vehicle, he saw the defendant, who told him to leave. When Varner informed the defendant that Brunelle had been to his house and that he was there to see "what was going on," the defendant told Varner that Brunelle was a liar, that there had been "a little beef," and that the police had already been there.

Varner and Freeman began to drive away but then turned around after deciding that things did not "seem right."[2] When they returned, Varner demanded to know where the victim was. The defendant claimed that the victim was not there. Despite the defendant's protests, Varner and Freeman entered the home and saw the victim's jacket in the kitchen. Again, Varner

---

[2] Johnson testified that he watched this interaction between the defendant and a man in a vehicle. Once Johnson observed the vehicle leave and return, he fled the scene and went to his mother's house. A short time later, the defendant arrived again, asking Johnson to help him dispose of the body. After Johnson refused, he and the defendant had no further communication that evening.

6

demanded to know where the victim could have gone without a jacket, and Varner and Freeman began to go from room to room, "yelling" the victim's name. While they searched the house, the defendant followed closely behind, pleading with them to leave.

As they again passed through the kitchen, Varner noticed for the first time what he believed to be a bloody fingerprint on the wall. At some point, Varner and Freeman walked past the door to the basement stairs. When they looked down, they discovered the bloody body of the victim. Varner told the defendant that he was calling the police before he and Freeman left the scene. Varner placed his first telephone call to 911 at 11:42 P.M.

At approximately 3 A.M. on Tuesday, January 18, 2000, the defendant contacted a friend, Bernard Williams, and asked him to come over to his house. The defendant confessed to Williams that he had stabbed the victim to death and had thrown his body down the stairs. Williams testified that the defendant killed the victim because "things had built up for a long time . . . [t]hey weren't treating him right . . . it was over money and disrespect."

At the close of the Commonwealth's case, the defendant's motion for a required finding of not guilty due to insufficient evidence was denied. The jury found the defendant guilty of

murder in the first degree on theories of premeditation and extreme atrocity or cruelty, and the defendant appealed.

After entry of the defendant's appeal in this court, he filed a motion for a new trial asserting that his trial counsel had been ineffective for failing to investigate and use an alibi defense and forensic evidence, and for failing to impeach a key witness for the Commonwealth.[3]  The motion judge, who also was the trial judge, denied that motion without a hearing, and she also denied the defendant's motion for reconsideration without a hearing.  The defendant appealed from the denial.

After filing a motion for deoxyribonucleic acid (DNA) testing, which was granted, the defendant filed a second motion for a new trial.  After an evidentiary hearing, the defendant's motion was denied.  He appealed, and that appeal was consolidated in this court with the appeal from his conviction and with the appeal from the denial of his first motion for a new trial.

Discussion.  1.  Denial of motion for a required finding of not guilty.  The defendant argues he was entitled to a not guilty verdict as a matter of law because there was legally

---

[3] The defendant's motion contained a request for funds to investigate and locate individuals supporting his alibi defense, to obtain a criminalist to review photographic and shoeprint evidence, and to test any material found under the victim's fingernails.

insufficient evidence connecting him to the crime. Specifically, he argues that the lack of forensic evidence -- no murder weapon was found, no DNA linked the defendant to the crime, and there was no definitive shoe print match -- "vindicate[s]" him in the face of "the testimony of professed crack cocaine addicts or others with a motive to lie."

This court must determine whether the evidence was sufficient to satisfy a rational trier of fact of each element of the crime beyond a reasonable doubt. Commonwealth v. Latimore, 378 Mass. 671, 677-678 (1979). "The relevant question is whether the evidence would permit a jury to find guilt, not whether the evidence requires such a finding." Commonwealth v. Brown, 401 Mass. 745, 747 (1988). The evidence against the defendant was substantial. Two witnesses placed the defendant at the scene of the crime, one of whom effectively witnessed the defendant murder the victim. Two other witnesses arrived on the scene as the defendant was attempting to dispose of the body or otherwise cover up the crime. A fifth witness testified that the defendant confessed to committing the murder a few hours after the crime took place.

"Once sufficient evidence is presented to warrant submission of the charges to the jury, it is for the jury alone to determine what weight will be accorded to the evidence." Commonwealth v. Ruci, 409 Mass. 94, 97 (1991), quoting

Commonwealth v. Hill, 387 Mass. 619, 624 (1982). While the defendant portrays these witnesses as untrustworthy addicts, "[c]redibility is a question for the jury to decide; they may accept or reject, in whole or in part, the testimony presented to them." Commonwealth v. Fitzgerald, 376 Mass. 402, 411 (1978). The defendant's claim that the testimony of the witnesses at his trial "was inherently unreliable is nothing more than an issue of credibility, an issue that is solely within the province of the jury." Commonwealth v. James, 424 Mass. 770, 785 (1997). There was no error.

2. Ineffective assistance of counsel. In this consolidated appeal, the defendant raises the same ineffective assistance of counsel arguments asserted in his motions for a new trial. We review the defendant's claim of ineffective assistance of counsel under G. L. c. 278, § 33E,[4] which provides a standard of review more favorable than the constitutional standard of review of such claims. See Commonwealth v. Wright, 411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014). Accordingly, we determine "whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have

_____

[4] The defendant incorrectly states that his motions for a new trial were entitled to plenary review by the motion judge pursuant to G. L. c. 278, § 33E. This is inaccurate. However, the defendant is entitled to plenary review by this court.

influenced the jury's conclusion." Wright, supra. "Where, as here, the trial judge also considered the motion for a new trial, we extend 'special deference' to the judge's action on the motion" (citation omitted). Commonwealth v. Barnett, 482 Mass. 632, 638 (2019).

a. Failure to impeach the Commonwealth's theory or timeline of events. The defendant argues that trial counsel failed to impeach the Commonwealth's theory of events using two key pieces of evidence: photographs of a dresser with bloody handprints located at the scene and Johnson's testimony that he was watching the third quarter of a televised professional basketball game when the defendant arrived to pick him up.

The defendant suggests that the photographs of the dresser demonstrate that "the house was searched, and that whoever did this appears to have left the property with great dispatch," thereby contradicting the Commonwealth's theory that the defendant killed the victim and remained at the scene for some time afterward. Further, the defendant asserts that this evidence contradicts the Commonwealth's "strong inference . . . that Norris was wearing gloves."

As the motion judge noted, "[t]his argument is purely speculative, as the defendant offers no support for his contention that evidence of the handprints would actually be inconsistent with [the defendant] having committed the crime."

The first 911 call reporting a disturbance occurred at 11:42 P.M.  Police did not secure the crime scene until after the third 911 call was made after 3:30 A.M.  Therefore, the victim was immobile in his home for over three hours.  The possibility that an unknown third party could have entered and ransacked the home during that time does not preclude the jury from finding that the defendant committed the murder.  This evidence is unlikely to have influenced the jury's conclusion in any way.

The defendant also cites his trial counsel's failure to impeach a key prosecution witness, Johnson, who testified that he was watching a basketball game when the defendant picked him up to go to the victim's home.  When asked if he remembered what time the defendant picked him up, Johnson testified, "It was at night, about -- I know it was a double basketball game that day, but I don't remember what time it was.  It was the Spurs they were playing, I know that much."  When asked if he remembered at approximately what part of the basketball game the defendant arrived, Johnson responded, "Yes, almost the end of the third quarter."  The defendant argues that after trial, it was determined that the basketball game Johnson referred to "began at 9:30 P.M. San Antonio time, later Springfield time, and ran two hours and 14 minutes."  Thus, Johnson could not have been watching this game until the end of the third quarter and been with the defendant at the time of the killing.

"Generally, failure to impeach a witness does not amount to ineffective assistance of counsel." Commonwealth v. Fisher, 433 Mass. 340, 357 (2001). Even using the more favorable standard of review under § 33E, a claim of ineffective assistance based on failure to use particular impeachment methods is difficult to establish. Id. "Trial counsel does not necessarily provide ineffective assistance by 'not prob[ing] every inconsistency'" (citation omitted). Commonwealth v. Jewett, 442 Mass. 356, 363 (2004). "[A]bsent counsel's failure to pursue some obviously powerful form of impeachment available at trial, it is speculative to conclude that a different approach to impeachment would likely have affected the jury's conclusion." Commonwealth v. Hudson, 446 Mass. 709, 715 (2006), quoting Fisher, supra. Here, impeachment as to the timing of the basketball game was unlikely to have influenced the jury, given that Brunelle testified that he brought the defendant and Johnson to the victim's house sometime after 10:30 P.M.[5]

---

[5] The defendant argued in his first motion for a new trial that "trial counsel was ineffective in impeaching Commonwealth witnesses with prior convictions." This claim has no merit. The defendant fails to identify which witness he is referring to or the nature of the convictions. Additionally, the Commonwealth's key witnesses all testified to current or former drug use, and the defendant has failed to establish how the introduction of a prior conviction would have influenced the jury.

b. Failure to properly investigate forensic evidence. The defendant argues that trial counsel failed to properly investigate and use two significant pieces of forensic evidence: the defendant's alleged footprint at the scene of the crime and DNA material found under the victim's fingernails.

At trial, a State trooper testified about numerous footprints that were found at the crime scene. She stated that a footprint that was found outside the house where the defendant was living was "consistent in tread pattern and overall physical size and shape" to footprints found at the Brickett Street house, allowing an inference that the footprints at the scene belonged to the defendant. The defendant maintains that if trial counsel had sought and obtained an expert in footprint evidence, he would have discovered that the footprint "was very far from a match." Such evidence was unlikely to have influenced the jury. First, numerous witnesses placed the defendant at the house and at least one saw the defendant in a struggle with the victim. Second, through cross-examination, trial counsel made the point that no footprints from anywhere matched a pair of sneakers that police had taken from the defendant. Finally, this footprint evidence was not a substantial component of the Commonwealth's case.[6] In closing

---

[6] The Commonwealth made no mention of the footprints in its opening statement. In closing argument, the Commonwealth

argument, the prosecutor cautioned the jury, "So, the footwear evidence in this case is not evidence that you should rely upon exclusively to reach some finding of guilt, but it is consistent, it is corroborative of the remainder of the evidence."[7]

The defendant also argues that trial counsel was ineffective for not testing the material found under the victim's fingernails. As presented during the evidentiary hearing on the second motion for a new trial, the testing revealed that the only DNA present under the victim's fingernails belonged to the victim himself. There was no DNA detected that could be attributed to a known or unknown third party. Had these results been presented at trial, they would not have influenced the jury's verdict. Contrast Commonwealth v. Cameron, 473 Mass. 100, 102 (2015) ("the newly available DNA evidence that conclusively excludes the defendant as a possible

_____

devotes only two sentences to this footprint: "There is another set of prints outside the [Brickett Street] house. They are consistent with a print found at the defendant's home, outside of the defendant's home . . . ."

[7] In his first motion for a new trial, the defendant also argues that an expert should have been used to examine photographs of cuts on his hands, which he claimed resulted from removing Christmas lights. The defendant has not shown that this would have helped him at trial where four witnesses put him at the scene of the murder.

donor likely would have been a real factor in the jury's deliberations").

c. <u>Failure to investigate alternative theories or suspects</u>. The defendant alleges trial counsel failed to investigate a variety of alternative theories and suspects. First, he argues that trial counsel did not offer evidence that police responded to the house to a report of a disturbance before the response when the victim was discovered and that, at that time, they found no blood or evidence of violence. At the hearing on the defendant's second motion for a new trial one of the police officers who had responded to the earlier call about this disturbance testified to details of what he and his partner did (i.e., checked the doors, walked around the house).

We begin by noting that, at trial, a police officer who had responded to the house when the victim was found testified that there had been an earlier call to which officers had responded but had found nothing. Thus, this information was before the jury. In any event, it is unclear how this evidence casts doubt on the Commonwealth's theory of the crime. As the motion judge observed, "Had such testimony been introduced, the jury could have inferred from the evidence at trial that the defendant committed the crime and left the scene only to return to the scene later and transfer the blood to the door and snow at that time."

Second, the defendant asserts that trial counsel did not introduce evidence of other parties with possible motives to kill the victim, including unknown drug associates from New York City and the victim's own brother, Rico, who apparently disappeared after the murder. Third, the defendant asserts that trial counsel failed to address the additional vehicles parked at the home on the night of the crime, as well as a tire track found then.

Defense counsel did present a third-party killer theory at trial by attempting to implicate two of the Commonwealth's key witnesses -- Brunelle and Johnson. However, typically, we do not characterize strategic decisions as ineffective assistance merely because they prove unsuccessful. See Commonwealth v. White, 409 Mass. 266, 272 (1991). We agree with the judge that the defendant has failed to identify any material evidence trial counsel would have discovered had he pursued these additional suspects; that there is nothing to indicate the outcome of trial would have been different had counsel advanced these other third-party culprits, who were "even more attenuated from the scenario than Brunelle and Johnson[; and that t]he evidence that other cars were parked at the house also would not likely have changed the outcome of the trial, for the same reasons." It was hardly unreasonable for trial counsel to focus on the witnesses who identified the defendant as the murderer, rather than

unidentified individuals or vehicles, in formulating a third-party culprit defense.

d. Failure to explore an alibi defense. The defendant argues that trial counsel "abandoned a possible alibi defense by not investigating the matter." In support of his first motion for a new trial, the defendant provided an affidavit from the grandmother of his children, who was prepared to testify that, on the night of the murder, she was at home watching the nightly news with the defendant and her daughter. The defendant also submitted an affidavit asserting the same thing and naming two persons, "Keith" and "Sue" (no last names provided), who "could have been located" at the time of trial to testify to his whereabouts on the night of the murder.[8]

The decision of defense counsel regarding the best defense to pursue at trial is a tactical one and will not be deemed ineffective unless manifestly unreasonable when made. Commonwealth v. Vao Sok, 435 Mass. 743, 758 (2002). "A strategy is manifestly unreasonable if 'lawyers of ordinary training and skill in the criminal law would [not] consider [it] competent.'" Commonwealth v. Velez, 479 Mass. 506, 512 (2018), quoting

---

[8] In his affidavit, the defendant identifies "Keith" only as someone "who drove a white van" and "Sue" as someone who "lived on State Street in Springfield, Massachusetts, next to the Getty gas station and worked . . . at Springfield Technical Community College for the dean or registrar."

Commonwealth v. Kolenovic, 471 Mass. 664, 674 (2015), S.C., 478 Mass. 189 (2017).

According to an investigative report submitted with the defendant's first motion for a new trial, the grandmother told a police officer that she had not seen the defendant for from one week to ten days prior to the crime, "as he had moved out and was no longer staying with her." However, at trial, Brunelle testified that he picked up the defendant from the grandmother's home. Given these inconsistencies, it was not unreasonable for trial counsel to decline to rely on the grandmother's testimony to establish an alibi defense.[9] Nor was it unreasonable for trial counsel to decline to investigate "Keith" or "Sue" when the defendant could not provide a last name or other relevant information about these unknown parties.[10]

3. Admission of alleged unduly prejudicial evidence. At trial, the Commonwealth presented the results of preliminary orthotolidine testing, which indicated the presence of blood in

---

[9] At an evidentiary hearing on the defendant's second motion for a new trial, trial counsel could not recall much about the case. He did recall that in preparing for trial, he relied on the defendant's girlfriend as a witness to establish an alibi. However, when the time came to call her at trial, the defendant insisted that she not be called to testify.

[10] The defendant did not provide any additional information about "Sue" or "Keith" in his second motion for a new trial; nor did he provide affidavits from them indicating what they would have testified to had they been called.

the vehicle that the defendant used to leave the crime scene.
Subsequent testing did not show the presence of blood.  The
defendant argues that these results were irrelevant and unduly
prejudicial, and that the jury were left with the impression
that there was evidence of blood in the vehicle.  The
Commonwealth concedes that there was no overt relevance to the
presence of stains in the vehicle as presented by an expert, but
argues that "the evidence is relevant to show steps taken in the
investigation."

The defendant did not object at trial to the admission of
the preliminary testing.  Thus, we review the issue to determine
whether there was an error, and if so, whether it resulted in a
substantial likelihood of a miscarriage of justice.  See
Commonwealth v. Javier, 481 Mass. 268, 287 (2019).

This court already has held that the results of
orthotolidine testing is permissible without the need for
further confirmatory evidence.  Commonwealth v. Duguay, 430
Mass. 397, 401-402 (1999).  In Duguay, the court stated that
there was no undue prejudice because the chemist informed the
jury that the test was presumptive, and she "acknowledged a long
list of substances other than human blood that could yield a
positive result."  Id. at 402.  Additionally, "[d]efense counsel

freely and repeatedly pointed out the limitations of the test."
Id.[11]

Here, trial counsel elicited on cross-examination that the
test was an initial screening test requiring further
confirmation for accuracy; that it could yield false positives,
which can result from metals, vegetable products, or rust; and
that all four wheel wells on the vehicle were rusted. The
expert also confirmed that subsequent testing was negative and
that no further tests were performed. In closing, defense
counsel emphasized the significance of this testimony, arguing,
"And when he takes that swab of what he thinks is the blood,
there may be false positives. As I have already said, it comes
up negative for blood. It wasn't blood. And if it was blood or
if they didn't trust the confirmatory test which came up

---

[11] Moreover, although subsequent testing revealed that there
was no blood present, the preliminary results are still relevant
-- albeit limited, given defense counsel's repeated attempts to
challenge the adequacy of the police investigation. See
Commonwealth v. Bowden, 379 Mass. 472, 485-486 (1980).
"'Evidence does not have to be conclusive of an issue to be
admissible'; admissible evidence may simply make [the]
Commonwealth's contention more probable than it would be without
that evidence." Commonwealth v. Javier, 481 Mass. 268, 288
(2019), quoting Commonwealth v. Pytou Heang, 458 Mass. 827, 851
(2011). The fact and manner in which the preliminary testing
was done provided the jury with information from which they
could have inferred that it was more likely that the criminal
investigation was adequate, despite defense counsel's closing
argument to the contrary. See Commonwealth v. Avila, 454 Mass.
744, 753 (2009) (Commonwealth has right to rebut Bowden
defense).

negative for blood, they would have done a third test.  But they didn't."  The Commonwealth did not reference the testing done on the vehicle in its closing.

We conclude that there was no error, but even if there was, given trial counsel's effective cross-examination and closing argument,[12] the admission of the orthotolidine testing did not create a substantial likelihood of a miscarriage of justice.

4.  Commonwealth's alleged destruction of exculpatory evidence.  The defendant argues that the judge erred in failing to sanction the Commonwealth for the alleged destruction of two pieces of exculpatory evidence.  The defendant asserts that Johnson initially made a handwritten statement to police, which the "police refused to take . . . saying it was not true, and that the statement should be ripped up."  The second piece of evidence is a statement by Williams, the witness who testified

---

[12] We note that defense counsel requested a jury instruction on the Commonwealth's failure to conduct tests, pursuant to Bowden, 379 Mass. at 486, which the judge denied.  "As we have stated many times . . . a judge is not required to instruct on the claimed inadequacy of a police investigation.  'Bowden simply holds that a judge may not remove the issue from the jury's consideration.'"  Commonwealth v. Williams, 439 Mass. 678, 687 (2003), quoting Commonwealth v. Boateng, 438 Mass. 498, 506-507 (2003).  Where, as here, the defendant alleges multiple investigatory failures, specifically the subsequent testing of potential blood evidence and the destruction of an exculpatory statement, see discussion infra, a Bowden instruction may be warranted. In this case, because the judge explicitly allowed the defense to "argue to the jury what the police should have done or failed to do" during closing argument, we find no error.

that the defendant confessed to him, which was ripped up by a detective.

Prior to jury empanelment, defense counsel filed a motion for sanctions, and the judge held an evidentiary hearing to determine whether the police had destroyed exculpatory evidence; she made findings of fact for each statement, as detailed infra. Defense counsel's motion for sanctions should be read as a motion to suppress, given that counsel explained he "could have entitled it a motion to suppress, but [he was] not sure what the appropriate sanction [was]."  In reviewing a ruling on a motion to suppress, we "accept the judge's subsidiary findings of fact absent clear error but conduct an independent review of his ultimate findings and conclusions of law."  Commonwealth v. Hobbs, 482 Mass. 538, 543 (2019), quoting Commonwealth v. White, 475 Mass. 583, 587 (2016).

a.  Johnson's statement.  The judge found that although Johnson may have made an oral or verbal statement, he did not produce a handwritten statement.  She also found that the defendant had not demonstrated that there was any material that would have been exculpatory to the defendant.

The judge did not commit error in finding that Johnson did not produce a handwritten statement.  Defense counsel did not call Johnson to testify during the evidentiary hearing. Although Johnson's mother initially testified that she was

unsure whether a handwritten statement was produced, she then remembered that he did produce one. On cross-examination, his mother again stated that she was unsure whether Johnson had produced a handwritten statement. On redirect, she testified she was "a little confused" about the handwritten statement. In contrast, the detective who had conducted the interview with Johnson testified that he never allowed suspects or witnesses to make handwritten statements, Johnson never provided a handwritten statement, and no such statement was torn up or destroyed.

Given the mother's wavering testimony and the detective's unequivocal assertion that no handwritten statement was made, the judge's findings were not clearly erroneous.

b. Williams's statement. The judge found that after the murder, Williams spoke with a detective who began taking his statement. Williams initially told the detective that he did not know anything about the murder and that the defendant did not say anything to Williams about the murder. The detective printed out Williams's statement and gave it to him. Williams affirmed the statement but did not sign it. The detective then indicated that he was privy to additional evidence about the murder and he knew Williams was lying. Upon hearing this, Williams stated that he was willing to tell the truth about what happened, and the detective ripped up Williams's unsigned

statement. Although the judge noted that she "frowned upon" the handling of the statement and found the police "quite culpable" in its destruction, she ultimately concluded that the destruction of the statement "was not done intentionally to deprive the defendant of any evidence." The judge further found that Williams's initial statement was exculpatory insofar as it could be used to impeach Williams's testimony at trial, but that it was not otherwise material to the defendant. In light of this conclusion, the judge ruled that defense counsel could explore the circumstances surrounding the destruction of Williams's initial statements and its purported content, including by cross-examining Williams and the detective who took his statement. The defendant argues that this remedy was inadequate.

"When a defendant makes a claim that the government has lost or destroyed potentially exculpatory evidence," he bears an initial burden of demonstrating a "reasonable possibility, based on concrete evidence" (citation omitted), that the lost or destroyed evidence was exculpatory in nature. Commonwealth v. Williams, 455 Mass. 706, 718 (2010). If the defendant makes such a showing, the judge "must proceed to balance the Commonwealth's culpability, the materiality of the evidence, and the prejudice to the defendant in order to determine whether the defendant is entitled to relief.". Id. "In reviewing the

denial of a motion based on the Commonwealth's loss [or destruction] of allegedly exculpatory evidence, we do not disturb the judge's decision absent a clear abuse of discretion."  Commonwealth v. Kee, 449 Mass. 550, 554 (2007).

Williams's initial statement indicated that the defendant had not said anything about the murder.  In light of Williams's subsequent statement and testimony at trial, there was a reasonable possibility that his initial statement was exculpatory as impeachment material.  The defendant has not shown, however, that the judge's remedy was inadequate, or that dismissal of the indictment was warranted.  "Dismissal of an indictment is a remedy that infringes 'severely on the public interest in bringing guilty persons to justice.'"  Commonwealth v. Olszewski, 416 Mass. 707, 717 (1993), cert. denied, 513 U.S. 835 (1994), quoting Commonwealth v. Cinelli, 389 Mass. 197, 210, cert. denied, 464 U.S. 860 (1983).

Defense counsel engaged in a thorough cross-examination of Williams about his initial statement and its contents.  The defendant has failed to show that anything contained within Williams's initial statement would have created a reasonable doubt as to the defendant's guilt, where defense counsel's cross-examination of Williams did not.  See Commonwealth v. Kater, 432 Mass. 404, 421 (2000).

5. Recusal of judge. The defendant argues that the judge erroneously failed to recuse herself when she discovered she had previously served as an attorney for the sister of a key Commonwealth witness.

Prior to the start of trial, the judge realized that, as a defense attorney, she had represented Johnson's sister in approximately 1985. During a sidebar, the judge informed both parties that she had "some familiarity" with the witness's family, including Johnson himself and his mother, who testified for the defense in this trial during an evidentiary hearing on the motion for sanctions. Regarding how this might affect her judgment, the judge emphasized that she was just "playing it safe": "I don't see where this will interfere with my ability to be an impartial jurist, but I wanted to put it on the record." Defense counsel was provided an opportunity to consult with his client, and reported that the defendant "[did] not see a problem" with the judge's prior representation.

"Because the defendant did not ask the judge to recuse herself prior to or during trial, we consider this claim to determine whether there was a substantial likelihood of a miscarriage of justice." Commonwealth v. Deconinck, 480 Mass. 254, 267 (2018). Here, the judge's decision not to recuse herself does not meet the standard. The judge represented the witness's sister in a drug case sixteen years earlier, far

removed from the crime at issue. The judge also explicitly stated on the record that she had considered her relationship with the witness's sister and did not think it would interfere with her ability to be impartial. See Commonwealth v. Daye, 435 Mass. 463, 470 (2001) ("Here, the judge properly weighed his conscience and determined that he could discharge his duties fairly and without prejudice to the defendant").

6. Cumulative error and relief under G. L. c. 278, § 33E. As there was no error, there could not be any substantial likelihood of a miscarriage flowing from allegations of unpreserved cumulative error. We decline to exercise our authority under G. L. c. 278, § 33E, to reduce the verdict or to order a new trial.

Conclusion. For the reasons stated, we affirm the defendant's conviction. Furthermore, we have reviewed the record in its entirety and conclude there is no basis on which to grant extraordinary relief under G. L. c. 278, § 33E. The denials of the defendant's motions for a new trial are also affirmed.

So ordered.